UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF GIRLIE J. LINGAD | Case No. 06mg1278-POR **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER** |

This matter has come before this Court pursuant to Title 18 United States Code, Section 3181, et. seq., for a hearing at the request of the Republic of the Philippines for the extradition of Girlie J. Lingad. This Court held an extradition hearing on November 6, 2007 and January 30, 2007. After having considered the evidence received at the hearing along with the arguments of counsel and the papers submitted prior to the hearing, this Court finds the person in custody before the Court is not extraditable under the extradition treaty between the United States of America and the Republic of the Philippines ("Treaty"). This Court also makes the following findings of fact and conclusions of law.

**I.**

**BACKGROUND OF THE CASE**

On July 7, 2006, the United States Attorney's Office for the Southern District of California, acting on behalf of the Republic of the Philippines, presented a complaint for extradition to this Court. The complaint requested that the Court issue a warrant for the arrest of Lingad with a view toward extradition. The United States Attorney's Office presented the complaint against Lingad

1    pursuant to the extradition treaty between the Philippines and the United States.

2        The complaint charged Lingad with the following crimes:

3        (a) *Criminal Case No. 415-2004* charges one (1) count of Qualified Theft under

4 Article 310 in relation to Article 308 through Falsification of Commercial Documents by a Private

5 Individual under Article 172(1), in relation to Article 171(4), of the Revised Penal Code of the

6 Republic of the Philippines.  According to the complaint, on February 20, 2004, a United Coconut

7 Planters Bank ("UCPB") customer tendered to Lingad an amount of money to be deposited into her

8 passbook savings account.  Lingad took the customer's money, but she made no entry into the

9 bank's computer system documenting this transaction nor did she deposit the money into the vault as

10 required by bank procedures.  Instead, Lingad made a typewritten notation in the depositor's

11 passbook, and pocketed the depositor's money for her use and benefit without the knowledge of

12 either the depositor or the bank.

13        (b) *Criminal Cases Nos. 542-2004 through 566-2004* charge 25 counts of Qualified

14 Theft, in violation of Article 310, in relation to Article 308 of the Revised Penal Code of the

15 Republic of the Philippines.  According to the complaint, Lingad committed these 25 offenses

16 between July 2002 and January 2004.  Lingad withdrew or pre-terminated numerous deposits and/or

17 placements of money with UCPB without the knowledge or consent of the depositor/investor

18 concerned or UCPB.  Lingad then pocketed the "withdrawals" for her own use and benefit.

19        (c) *Criminal Case No. 487-04* charges one (1) count of Qualified Theft under Article

20 310 in relation to Article 308 through Falsification of Commercial Documents by a Private

21 Individual under Article 172(1), in relation to Article 171(4), of the Revised Penal Code of the

22 Philippines.  According to the complaint, on October 30, 2003, Lingad fraudulently issued a

23 Manager's Check that withdrew from an account that had no money at the time Lingad prepared the

24 check.

25    On July 7, 2006, the Honorable Jan M. Adler issued a warrant for the arrest of Lingad

26 pursuant to the complaint filed by the United States Attorney's Office on behalf of the Republic of

27 the Philippines.  Lingad was arrested on July 7, 2006, and made her initial appearance before this

28 Court on July 10, 2006.

1    On November 6, 2006, this Court held an extradition hearing.  At the hearing, the Court
2  requested that the government of the Philippines, as represented by the United States Attorneys'
3  Office ("Government"), clarify certain pages of the extradition packet.  The Government was unable
4  to provide the Court with any clarification at the hearing.  The Government represented that further
5  correspondence with the Philippine government was necessary in order to address the Court's
6  concerns.  The Court permitted the Government to provide supplemental submissions addressing
7  these matters.

8    Counsel for Lingad requested a continuance to determine whether the Philippine government
9  will be dropping some or all of the charges against Lingad based on a motion for reconsideration
10  filed by Lingad's attorneys in the Philippines.  The Government objected to continuing the hearing
11  on this basis.  The Court denied the request to continue the hearing.  When the Court reached the
12  issue of "identity," the Government requested a continuance on this issue so that additional evidence
13  may be gathered and presented at a later time.  Counsel for Lingad objected to this request.  The
14  Court granted the Government's request and continued the hearing to January 11, 2007.

15    On January 8, 2007, the Court held a conference.  Counsel for the Government represented
16  he recently received the documents necessary for the supplemental submissions and therefore
17  requested a continuance of the hearing set for January 11, 2007.  The Court continued the hearing
18  and set it for January 30, 2007.

19    On January 30, 2007, the Court held the extradition hearing.  On the issue of identity, the
20  Government presented a color photograph of the same black-and-white photograph included in the
21  extradition packet.  No other evidence pertaining to identity was presented.  Counsel for the
22  Government requested that the hearing be continued again so that he can obtain a witness and/or
23  more evidence to prove identity.  Counsel for Lingad objected to continuing the hearing any further.
24  The Court denied the Government's request to continue.  The extradition hearing concluded and the
25  matter was submitted on January 30, 2007.

26  ///
27  ///
28  **///**

## II.

## <u>GENERAL PRINCIPLES REGARDING EXTRADITION HEARINGS</u>

The sole purpose of an extradition hearing, held pursuant to 18 U.S.C. § 3184 (and the applicable Extradition Treaty), is to determine whether or not the individual who has been arrested in the United States pursuant to a complaint filed on behalf of a foreign government is subject to surrender to the requesting country.  The substantive right of a foreign country to request the return of a fugitive and the duty of the United States to deliver the fugitive depends entirely on the existence of a treaty between the requesting nation and the United States.  18 U.S.C. § 3181, <u>Factor v. Laubenheimer</u>, 290 U.S. 276 (1933).  To invoke its right to extradite a fugitive, the requesting nation must submit its request to a state or federal court.  18 U.S.C. § 3184.  The court determines whether the fugitive is subject to extradition, and, if so, must order the fugitive's commitment and certify the supporting record to the Secretary of State.  <u>Id.</u>  The Secretary of State bears the responsibility for deciding whether surrender will ultimately occur.  18 U.S.C. § 3186; <u>Escobedo v. United States</u>, 623 F.2d 1098, 1105 n.20 (5th Cir.), <u>cert. denied</u>, 449 U.S. 1036 (1980).  The fugitive cannot obtain direct appellate review of either the extraditing court's decision, <u>Collins v. Miller</u>, 252 U.S. 364, 369 (1920); <u>Gusikoff v. United States</u>, 620 F.2d 459, 461 (5th Cir. 1980), or the Secretary of State's exercise of discretion.  <u>Escobedo</u>, 623 F.2d at 1105.  The fugitive may obtain habeas corpus relief on the grounds of lack of probable cause, failure to prove identity, or failure to charge an offense within the meaning of the treaty.  <u>Gusikoff</u>, 620 F.2d at 461.

The Government must prove several elements before Lingad may be found extraditable by this Court.  These elements roughly fall into six categories: (1) that the Court has jurisdiction to decide the question of extradition; (2) that a treaty of extradition exists between the United States and the Republic of Philippines and that the crimes with which Lingad has been charged are covered by that treaty; (3) that Lingad has been charged with such offenses in the requesting country; (4) that the offenses with which Lingad is charged in the Republic of Philippines are also offenses in the United States (dual criminality); (5) that there is some evidence warranting the finding that there is reasonable ground to believe Lingad is guilty (probable cause); and (6) that Lingad is the same individual charged with the offenses by the requesting party (identity).  <u>Caplan v. Vokes</u>, 649 F.2d

1336 (9th Cir. 1981); <u>Fernandez v. Phillips</u>, 268 U.S. 311 (1925).

In short, the paramount principle of every extradition proceeding is to determine whether probable cause exists to believe the person whose surrender is sought has committed the crime of which her extradition is requested.  <u>Collins v. Loisel</u>, 259 U.S. 309, 315 (1922); <u>Gusikoff</u>, 620 F.2d at 462.

### III.

### <u>SUMMARY OF FACTS UNDERLYING ALLEGED OFFENSES</u>[1]

The Republic of the Philippines seeks to extradite Lingad on the following charges: (i) one count of Qualified Theft under Article 310 in relation to Article 308 through Falsification of Commercial Documents by a Private Individual under Article 172(1), in relation to Article 171(4), of the Revised Penal Code of the Republic of the Philippines; (ii) 25 counts of Qualified Theft under Article 310 in relation to Article 308 of the Revised Penal Code of the Republic of the Philippines; and (iii) one count of Qualified Theft through Falsification of Commercial Documents by a Private Individual under Article 172(2) in relation to Article 171 of the Revised Penal Code of the Republic of the Philippines.  All of the charges pertain to the alleged theft of money by Lingad from the UCPB where she was employed during the period in which the thefts occurred.

**1.      One Count of Qualified Theft through Falsification of Commercial Documents by a Private Individual**

On February 20, 2004, Raquel Elvidge, a depositor of UCPB, tendered to Lingad, the sum of 250,000 pesos for the purpose of opening a Premium Savings Deposit ("PSD") account.  Lingad received the said amount pursuant to her duties as Marketing Associate of UCPB.

The standard operating procedures of UCPB required Lingad to place the money in the bank vault or such other depository for cash as may be designated by UCPB, encode the deposit in the bank's computerized PSD system, and print the transaction on the passbook of the depositor directly from the computer printer.  However, Lingad did not follow these procedures.  Lingad did not encode the deposit in the PSD system and had the transaction typewritten on the depositor's

---

[1] The summary of facts are taken from the affidavits of Ramon Chito R. Mendoza and Ma. Edene M. Recio (Annex I-A: Annex A, Annex I-B: Annex A.)

passbook.  Thus, per bank records, no deposit was made by the depositor on that date, while the depositor was made to believe, by the entries typewritten by Lingad on her passbook, that her deposit was duly accepted and recorded by UCPB.  Lingad then took the deposit in question and pocketed the same for her personal use and benefit without the knowledge or consent of the depositor or UCPB.

### 2.    25 Counts of Qualified Theft

On various dates beginning in July 2002 up to January 2004, Lingad withdrew or pre-terminated numerous deposits and/or placements with UCPB without the knowledge or consent of the depositor/investor concerned or UCPB.

On July 3, 2002, Lingad pocketed for her own benefit the sum of 10,240,000.00 pesos from the Money Market ("MM") placement of William Chieng, without the knowledge, authority or consent of the depositor/investor or UCPB.  To avoid detection by UCPB, she made it appear that the depositor/investor pre-terminated the amounts of 9,503,325.00 pesos and 736,675.00 pesos by encoding the required entries in UCPB's computer system.  In order to make the depositer/investor believe his placement and interest earned were intact, Lingad issued official receipts on August 2, 2002, October, 1, 2002, December 2, 2002, January 31, 2003, and March 26, 2003.  These receipts showed the depositor/investor that his MM placement was simply rolled-over or re-invested upon maturity.

When Chieng withdrew his MM placement on April 23, 2003, Lingad prepared Manager's Check ("MC") No. 5305 in the amount of 10,405,873.24 pesos.  MC No. 5305 should have been printed from the computer printer upon completion of the encoding of the transaction in UCPB's computer system, but because the account in question already had a zero balance, Lingad used a typewriter to print the entries on MC No. 5305.  When MC No. 5305 was paid, UCPB suffered damage in the amount of 10,405,873.24 pesos.

Lingad funded MC No. 5305 with withdrawals of 6,405,873.24 pesos and 4,000,000.00 pesos from two different PSD accounts, both in the name of another UCPB depositor.  Both withdrawals were encoded by Lingad in UCPB's computer system, without the required documentation and without the knowledge or consent of the depositor or UCPB itself, to make it

1    appear in UCPB's records that the depositor effected the withdrawals.

2        On November 4, 2002, Lingad pocketed for her own benefit the sum of 12,434,936.30 pesos

3    from the MM placement of Chieng, without the knowledge, authority or consent of the

4    depositor/investor or UCPB itself.  To avoid detection by UCPB, she encoded entries in UCPB's

5    computer system to make it appear that Chieng (1) opened Savings Account ("SA") No. 218-

6    115824-7; and (2) preterminated his MM placement and deposited the proceeds thereof to SA No.

7    218-115824-7.  Lingad took full and absolute control of this savings account.

8        By being in control of the fictitious SA, Lingad was able to withdraw and pocket for her own

9    use and benefit from the account on various dates.  She was able to conduct these transactions by

10   encoding entries in UCPB's computer system, without the knowledge or authority of the

11   depositor/investor or UCPB, to make it appear that the depositor/investor withdrew from the fictious

12   account.  In order to make the depositor/investor believe that his placement and interest were intact,

13   Lingad issued official receipts all tending to show that his MM placement was simply rolled-over or

14   re-invested upon maturity.

15       On April 9, 2003, in anticipation of the withdrawal of the MM placement by Chieng, Lingad

16   encoded entries in UCPB's computer system without the required documentation, authority or

17   consent of the depositor or bank.  Lingad took these actions to (1) to make it appear that the amount

18   of 12,438,350.00 pesos was withdrawn from PSD Account No. 1860-A by the owner of the account;

19   and (2) to balance the bank's records, make it appear that Chieng opened PSD Account No. 1835-D

20   and deposited the same amount as initial deposit.  In actuality, Lingad opened PSD Account No.

21   1835-D without the knowledge or consent of Chieng, who did not open the account with UCPB.

22   This account constituted another fictitious account set up by Lingad.

23       On April 10, 2003, when Chieng withdrew or preterminated his MM placement, Lingad

24   prepared MC No. 5288 in the amount of 12,438,781.89 pesos representing the principal and interest

25   on Chieng's investment.  Lingad funded the payment for the MC with the deposit under fictitious

26   PSD Account No. 1835-D.  In turn, the funding for PSD Account No. 1835-D came from PSD

27   Account No. 1860-A in the name of another depositor.

28       On various dates in August 2003, Lingad withdrew and pocketed various sums from

1  Chieng's PSD Account No. 1835-E without his knowledge or consent.  When the account matured

2  on October 30, 2003, and Chieng withdrew his deposit, Lingad prepared and processed an

3  application for an MC in the amount of 11,254,972.00 pesos.  She then caused the issuance of MC

4  No. 5542 in the same amount to Chieng for the principal and interest.

5  Finally, Lingad withdrew and pocketed various sums from Chieng's PSD Account No. 2268-

6  E on various dates in December 2003.  When the account matured on April 16, 2004, and Chieng

7  withdrew his deposit, Lingad processed and caused the issuance of MC No. 5763 in the amount of

8  5,134,947.62 pesos.  However, the balance of the deposit under the account amounted to 391,528.67

9  pesos since Lingad had withdrawn 4,743,418.95 pesos for her own benefit.

10  **3.  One Count of Qualified Theft Through Falsification of Commercial Documents**

11  **by a Private Individual**

12  In connection with the crime of Qualified Theft, Lingad caused the issuance of MC No.

13  5542, a commercial document, in the amount of 11,254,972.00 against an account with zero balance.

14  **IV.**

15  **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

16  After consideration of the documentary evidence and oral argument, this Court finds that the

17  government of the Philippines, as represented by the United States Department of Justice, has

18  established that:

19  1.  The documents submitted in support of the Philippines' extradition request are in

20  proper form and properly authenticated.  Section 5(a) of Article 10 of the Extradition Treaty and 18

21  U.S.C. § 3190 require that the documents submitted by the Philippines be received and admitted into

22  evidence if the principal consular officer of the United States has certified the authentication of the

23  documents.  The documents were certified on January 23, 2006, by David Buchholz, attorney

24  advisor in the office of legal counsel, U.S. Department of State, Washington D.C. and Richard D.

25  Haynes, principal consular officer for the United States in the Philippines, in accordance with 18

26  U.S.C. § 3190.  Thus, the authenticated documents were properly received into evidence.

27  2.  This Court has jurisdiction to determine the question of extradition.  18 U.S.C. §

28  3184.  This Court also has jurisdiction over the individual in custody before this Court, who is

1  alleged to be Lingad, and was found in the Southern District of California.  The Court's authority to

2  conduct this extradition hearing is not challenged.

3        3.        There is a valid extradition treaty in force and effect between the United States and

4  the Republic of the Philippines.  The Treaty was signed on November 13, 1994, and went into effect

5  on November 22, 1996.  A copy is attached to the extradition packet.  A U.S. Consular Officer,

6  Richard D. Haynes, Counsel General of the U.S.A. in the Philippines, also certified the copy as the

7  treaty.  Additionally, the fact that there is a valid treaty in force and effect between the United States

8  and the Philippines is not disputed.

9        4.        The crimes charged against Lingad are covered by the Treaty.  Article 2(1) of the

10  Treaty defines extradictable offense as one "punishable under the laws of both Contracting Parties

11  by deprivation of liberty for a period of more than one year, or more severe penalty."  The Treaty

12  does not contain an annex of covered crimes but incorporates dual criminality as the standard.

13        The Philippine crimes charged are: (i) one count of Qualified Theft under Article 310 in

14  relation to Article 308 through Falsification of Commercial Documents by a Private Individual

15  under Article 172(1), in relation to Article 171(4); (ii) 25 counts of Qualified Theft under Article

16  310 in relation to Article 308; and (iii) one count of Qualified Theft through Falsification of

17  Commercial Documents by a Private Individual under Article 172(2) in relation to Article 171.  The

18  elements of these offenses are set forth in the extradition packet.

19        The comparable crimes in the United States are set forth at 18 U.S.C. § 1005, which sets

20  forth several crimes associated with Bank Entries, Reports, and Transactions, and 18 U.S.C. § 656,

21  Theft, Embezzlement, or Misapplication by Bank Officer or Employee.  All of these crimes are

22  punishable by more than one year in custody and therefore satisfy the dual criminality provision of

23  Article 2 of the Treaty.  Further, there is no dispute that the crimes charged are covered by the

24  Treaty.

25        5.        There are criminal charges pending against Lingad in the Philippines.  There is

26  no dispute that there are charges pending against Lingad in the Philippines for the offenses for which

27  extradition is sought.  In the extradition packet submitted by the Republic of the Philippines, there

28  are 27 Informations that charge Lingad with the offenses outlined above.  There are also arrest

warrants contained in the packet.  Based on the Informations and arrest warrants, Lingad is wanted in three different divisions of the Philippine Courts (one for the first count, one for the next 25 counts, and one for the final count).

6.      The offenses with which Lingad is charged in the Republic of the Philippines are also offenses in the United States (dual criminality).  Article 2 of the Treaty provides: "An offense shall be an extraditable offense if it is punishable under the laws in both Contracting Parties by deprivation of liberty for a period of more than one year or by a more severe penalty."  In accordance with Article 2, the Court will consider "criminal provisions in federal law, or, if none, the law of the place where the fugitive is found or, if none, the law of the preponderance of the states." Cucuzzella v. N. Kelikoa, 638 F.2d 105, 107 (9th Cir. 1981).  The Supreme Court explained the dual criminality requirement in Collins v. Loisel, 259 U.S. 309, 312 (1922):

> The law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or in other respects, the same in the two countries.  It is enough if the particular act charged is criminal in both jurisdictions.

Citing Collins, some courts have held that the dual criminality doctrine requires only that the act alleged to have been committed constitute a crime in both countries.  In Bozilov v. Siefert, 983 F.2d 140 (9th Cir. 1992), the Court of Appeals for the Ninth Circuit further explained this concept:

> "Dual criminality does not require that an offense in a foreign country have an identical counterpart under the laws of the United States."  Dual criminality requires only that the acts alleged constitute a crime in both jurisdictions.  Each state may name and penalize the crime differently.

Id. at 142 (citations omitted) (quoting in part, Theron v. United States Marshal, 832 F.2d 492, 496 (9th Cir. 1987), cert. denied, 486 U.S. 1059, (1988)).  In other words, the Ninth Circuit stated that the elements of the alleged offense need not be identical as long as the same conduct constitutes a crime in both countries.  Oen Yin-Choy v. Robinson, 858 F.2d 1400, 1404-05 (9th Cir. 1988), cert. denied, 490 U.S. 1106 (1989).

As stated above in Paragraph 4, the facts alleged constitute the offenses of (1) bank entries, reports and transactions, and (2) theft, embezzlement, or misapplication by bank officer or employee in the United States under 18 U.S.C. § 1005 and § 656, respectively.  Although the offenses are not

06mg1278

identically phrased in the United States and Philippines, the aforementioned crimes in the United States are substantially analogous to the crimes of (i) Qualified Theft under Article 310 in relation to Article 308 through Falsification of Commercial Documents by a Private Individual under Article 172(1), in relation to Article 171(4); (ii) Qualified Theft under Article 310 in relation to Article 308; and (iii) Qualified Theft through Falsification of Commercial Documents by a Private Individual under Article 172(2) in relation to Article 171.  Additionally, the crimes charged are punishable by more than one year imprisonment in both the requesting and requested nations.  Accordingly, the requirement of dual criminality under the Treaty is satisfied.

7.      The issue of probable cause in extradition hearings is defined in accordance with the federal law and has been described as "evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt."  Coleman v. Burnett, 477 F.2d 1187 (D.C. 1973); see Sidona v. Grant, 619 F.2d 167 (2nd Cir. 1980); Greci v. Birknes, 527 F.2d 956, 959 (1st Cir. 1976).

Applying this standard to the evidence presented by the Philippines, a showing of probable cause has been made with respect to the criminal charges for which extradition is sought.

The Court finds probable cause to believe the offenses charged were committed by Lingad based on the evidence as more fully set forth in detail in the attached tables which are incorporated herein by reference.

8.      Finally, the Court must determine that the person in custody before the Court is the person charged in the Republic of the Philippines and for which extradition is sought.

The issue of identity came before this Court on two occasions - November 6, 2006 and January 30, 2007.  On November 6, 2006, the issue of identity was continued to January 11, 2007 upon request of the Government.  On January 8, 2007, the hearing was continued again, upon request of the Government, to January 30, 2007.  On January 30, 2007, after continuing the case for 85 days, the Government, with notice of the need to satisfy the burden of proof on identity, only presented a color photograph of the same black-and-white photograph contained in the extradition packet.  The Government provided no further evidence on the issue of identity.  Based on the numerous continuances at the Government's request, the delay in proceeding and the detriment of

1   such delays to the person in custody before the Court, this Court accepts the color photograph as the

2   Government's proof of identity and grants no further continuances.

3          The Court has carefully examined both the color and black-and-white photographs presented

4   and cannot with any reasonable certainty conclude that the individual depicted in the photographs is

5   the same individual before the Court.  Based thereon, the Court finds the Republic of the Philippines

6   has failed in its burden to show that the person wanted by the Philippines is the individual before the

7   Court.

8                                            **V.**

9                                       **CONCLUSION**

10         The Court finds: (1) that the Court has jurisdiction to decide the question of extradition; (2)

11   that a treaty of extradition exists between the United States and the Republic of Philippines and that

12   the crimes with which Lingad has been charged are covered by that treaty; (3) that Lingad has been

13   charged with such offenses in the requesting country; (4) that the offenses with which Lingad is

14   charged in the Republic of Philippines are also offenses in the United States (dual criminality); and

15   (5) that there is some evidence warranting the finding that there is reasonable ground to believe

16   Lingad is guilty (probable cause).  However, the Republic of the Philippines has failed to prove that

17   the person in custody before the Court is the same individual charged with the offenses by the

18   requesting party (identity).  Therefore, the Court DENIES the request for extradition with respect to

19   the charged offenses and sets a Status Hearing on **February 23, 2007** at **2:00 p.m.**

20         **IT IS SO ORDERED**.

21

22   DATED:  February 16, 2007

23                                         _____

24                                         LOUISA S PORTER
                                          United States Magistrate Judge
25

26   cc:     All parties
27

28

**(1)     One (1) count of Qualified Theft under Article 310 in relation to Article 308 through Falsification of Commercial Documents by a Private Individual under Article 172(1), in relation to Article 171(4)**

<u>**Summary of Charge**</u>:  On February 20, 2004, Raquel Elvidge tendered 250,000.00 pesos to Lingad for the purpose of opening a Premium Savings Deposit Account (PSD).  Lingad pocketed the 250,000.00 pesos instead of depositing the sum into a PSD account.  The supporting evidence below shows that Lingad did not enter the transaction into the Bank's system, and therefore she left no record of the transaction.

| Date of Transaction | Information Annex | Evidence Supporting Charge |
|---|---|---|
| Feb 20, 2004 | A-1 | <u>Annex 1</u>:  Affidavit of Mark and Raquel Elvidge, confirming that Raquel Elvidge gave Lingad 250,000.00 pesos to deposit into a Premium Savings Deposit on February 20, 2004.<br><br><u>Annex 2</u>:  Teller's Item Entry Report (TIER) which shows all of the cash received by Lingad as processed on her terminal on February 20, 2004.  Elvidge's deposit does not appear on this printout.<br><br><u>Annex 3</u>:  Copy of Elvidge's passbook.  According to Recio's affidavit (Annex A), Lingad should have encoded the transaction in the PSD system.  Because she did not do so and used a typewriter to type the required entries in Elvidge's passbook, the transaction was not recorded in the Bank's system.<br><br><u>Annex 4</u>:  Copy of the printout of transactions on February 20, 2004.  Elvidge's deposit does not appear on this printout.<br><br><u>Annex 5</u>:  Affidavit of Danilo De La Cruz, Security Guard of the Ultra Agency assigned at the Olongapo City Branch of the UCPB, including his logbook for April 17, 2004 showing Lingad's entry. |

1

**(2)      25 counts of Qualified Theft under Article 310 in relation to Article 308**

1.      **Account**:  Money Market Placement of Mr. Chieng and PSD Account Nos. 1860-B &
         1860-I of 3rd party account holders.
         **Damage to Bank**:  10,405,873.24 pesos
         **Dates of Offense**:  July 3, 2002, April 23, 2003

| Date of Transaction | Bank Account | Information Annex | Evidence Supporting Charges |
|---|---|---|---|
| July 3, 2002 | Money Market placement | B-1 | **Summary of Charge**:  On July 3, 2002, Lingad withdrew 10,240,000.00 pesos from Chieng's Money Market placement without the knowledge or consent of Chieng or UCPB (Bank). <br><br> Annex 1:  Official Receipt (OR) No. A1781395 covering Chieng's Money Market (MM) placement from which Lingad made unauthorized withdrawals or pre-terminations. <br><br> Annex 2: Online Journal Listing Teller TIER for July 3, 2002 shows Lingad's teller ID 2840 and a transaction involving 736,675.00 pesos and 9,503,325.00 pesos which totals 10,240,000.00 pesos. <br><br> Annex 4, 4-A, 4-B, 4-C, & 4-D:  Original Receipts issued by Lingad to show Chieng that his MM placement was rolled over or re-invested. |
| April 23, 2003 | 1860-I | B-19 | **Summary of Charge**:  Lingad withdrew 4,000,000.00 pesos from a third party account holder without his/her authorization.  Lingad used this money to pay Chieng, who was withdrawing his MM placement. <br><br> Annex 5 and 5-A:  PSD/CTD printouts showing Lingad withdrew 4,000,000.00 pesos from account number 1860-I to fund Manager's Check No. 5305, dated April 23, 2003.  No documentation of these withdrawals could be found except from the PSD/CTD printouts. Lingad used Manager's Check No. 5305 to pay Chieng, who was withdrawing his MM placement. |

| Date of Transaction | Bank Account | Information Annex | Evidence Supporting Charges |
|---|---|---|---|
| | | | Annex 6:  Copy of Manager's Check No. 5305. Lingad was the one who processed this check.<br><br>Annex 6-A:  Proof Sheet re: Manager's Check No. 5305 showing Lingad prepared this check.. |
| April 23, 2003 | 1860-B | B-21 | **Summary of Charge**:  Lingad withdrew 6,405.873.24 pesos from a third party account holder without his/her authorization.  Lingad used this money to pay Chieng, who was withdrawing his MM placement.<br><br>Annex 5 and 5-A:  PSD/CTD printouts showing Lingad withdrew 6,405,873.24 pesos from account number 1860-B to fund Manager's Check No. 5305, dated April 23, 2003.  No documentation of these withdrawals could be found except from the PSD/CTD printouts. Lingad used Manager's Check No. 5305 to pay Chieng, who was withdrawing his MM placement.<br><br>Annex 6:  Copy of Manager's Check No. 5305. Lingad was the one who processed this check.<br><br>Annex 6-A:  Proof Sheet re: Manager's Check No. 5305 showing Lingad prepared this check.. |

2. **Account**:  Money Market Placement of Mr. Chieng and PSD Account Nos. 1835-D &
   1860-A of 3rd party account holders.
   **Damage to Bank**:  12,438,781.89 pesos
   **Dates of Offense**:  November 4, 2002 – April 10, 2003

| Date of Transaction | Bank Account | Information Annex | Evidence Supporting Charges |
|---|---|---|---|
| Nov 4, 2002 | Money Market placement | B-4 | **Summary of Charge**:  Lingad pocketed the sum of 12,434,936.30 pesos from Chieng's MM placement.  To avoid detection by UCPB, she encoded entries in UCPB's computer system to make it appear that Chieng (1) opened Savings Account (SA) No. 218-115824-7; and (2) pre-terminated his MM placement and deposited the proceeds thereof to the fictitious account, SA No. 218-115824-7. |
| | | | Annex 7 and 7-A:  Certificate of Payment (COP No. 8-03608580) that Lingad used to terminate, Chieng's MM placement, w/o his authorization.  It shows the initial deposit of 12,427,376.44 pesos.  The absence of a signature on the backside of the COP shows that the client did not authorize the withdrawal.  According to Recio's affidavit, the MM placement earned interest and therefore, Lingad withdrew a total of 12,434,936.30 pesos. |
| | | | Annex 8:  Official Receipt Lingad used to show Chieng that his money is still on deposit and intact in his account. |
| | | | Annex 9:  Printout of Online Journal Listing TIER which shows how Lingad opened a fictitious Savings Account (SA No. 218-115824-7) in Chieng's name and deposited 12,434,936.30 pesos into that account. |
| | | | Annex 10:  Printout from CASA system of Savings Account No. 218-115824-7 in Chieng's name.  According to Chieng's affidavit (Annex 3), he did not open this account.  This printout shows the transactions conducted in this account. |
| | | | Annex 11, 11-A, & 11-B:  Original Receipts |

4

| Date of Transaction | Bank Account | Information Annex | Evidence Supporting Charges |
|---|---|---|---|
| | | | issued by Lingad to make Chieng believe his MM placement was intact. |
| April 9, 2003 | 1860-A | B-5 | **Summary of Charge**:  On April 9, 2003, LINGAD opened Account No. 1835-D in Chieng's name and deposited 12,438,350.00 pesos into that account.  Lingad took this amount from Account No. 1860-A without the authorization of the account holder.<br><br>Annex 12:  Printout from PSD/CTD Monitoring System showing withdrawal of 12,438,350.00 pesos from account no. 1860-A.  According to Recio's affidavit, Lingad's transactions are not documented, but the withdrawal from account no. 1860-A appears in the PSD/CTD Monitoring System.<br><br>Annex 13:  Printout from PSD/CTD Monitoring System showing opening of account no. 1835-D.<br>Annex 14:  Copy of Manager's Check No. 5288.  On April 10, 2003, Chieng withdrew or pre-terminated his MM placement.  Lingad issued Manager's Check No. 5288 payable to Chieng in the amount of 12,438,781.89 pesos. Lingad funded this check through Account No. 1835-D.<br><br>Annex 15:  Payment slip for Manager's Check no. 5288. |

5

3.    **Account**:  Premium Savings Deposit (PSD) Account No. 1835-E of Mr. Chieng
        **Damage to Bank**:  11,254,972.00 pesos
        **Dates of Offense**:  August 4, 2003 –  August 25, 2003

**Summary of Charges**:  From August 4, 2003 to August 25, 2003, Lingad withdrew the amounts listed below from Chieng's Premium Savings Deposit (PSD) Account No. 1835-E without the knowledge or authority of Chieng or the Bank. The total sum of Lingad's withdrawals amounts to 11,073,050.48 pesos.  When Chieng's PSD account matured, Lingad issued Manager's Check No. 5542 in the amount of 11,254,972.00 pesos payable to Chieng.  Thus, Lingad caused damage to the Bank in the amount of 11,254,972.00 pesos.  Each of Lingad's unauthorized withdrawals is one charge of Qualified Theft.  These unauthorized transactions constitute 10 of the 25 counts of Qualified Theft against Lingad.

6

| Date of Transaction | Bank Account | Information Annex | Evidence Supporting Charges |
|---|---|---|---|
| Aug 4, 2003 | 1835-E | B-18 | Annex 16:  PSD deposit slip Lingad gave Chieng after opening PSD Account No. 1835-E.<br><br>Annex 17:  Printout of PSD/CTD Monitoring System showing Lingad's withdrawals from PSD Account No. 1835-E.  There is no other documentation relating to these withdrawals.  According to Recio's affidavit, there should have been PSD payment slips submitted with the client's signature as required by Bank regulations in order to effect the withdrawals.  According to Chieng's affidavit (Annex 3), he denies having any transactions with the Bank on the dates listed on the PSD/CTD Monitoring System printout.<br><br>Annex 18:  Copy of Acknowledgement Receipt issued by Lingad to make Chieng believe that the deposit under PSD Account No. 1835-E, as well as the interest thereon, was intact.<br>Annex 19:  Application to purchase a manager's check.  Lingad needed a manager's check in order to process Chieng's payment of 11,254,972.00 (principal plus interest) since PSD Account No. 1835-E had matured.<br><br>Annex 20:  PSD payment slip prepared by Lingad.  The validation entries on this payment slip are typewritten.  According to Recio's affidavit, the correct procedure is to print out the validation entries from the computer printer.<br><br>Annex 21:  Manager's Check No. 5542 in the amount of 11,254,972.00 pesos. |
| Aug 5, 2003 | 1835-E | B-6 | Same as August 4, 2003. |
| Aug 7, 2003 | 1835-E | B-17 | Same as August 4, 2003. |
| Aug 8, 2003 | 1835-E | B-7 | Same as August 4, 2003. |
| Aug 8, 2003 | 1835-E | B-16 | Same as August 4, 2003. |
| Aug 11, 2003 | 1835-E | B-14 | Same as August 4, 2003. |

| Date of Transaction | Bank Account | Information Annex | Evidence Supporting Charges |
|---|---|---|---|
| Aug 13, 2003 | 1835-E | B-13 | Same as August 4, 2003. |
| Aug 18, 2003 | 1835-E | B-2 | Same as August 4, 2003. |
| Aug 20, 2003 | 1835-E | B-25 | Same as August 4, 2003. |
| Aug 25, 2003 | 1835-E | B-12 | Same as August 4, 2003. |

4.      **Account**:  Premium Savings Deposit (PSD) Account No. 2268-B of Mr. Chieng
        **Damage to Bank**:  4,863,377.67 pesos
        **Dates of Offense**:  December 4, 2003 – December 15, 2003

**Summary of Charges**:  On December 4, 2003, Chieng deposited 5,000,000.00 pesos into PSD Account No. 2268-B (PSD account).  Lingad withdrew a total sum of 4,743,418.95 pesos from Chieng's PSD account, without the knowledge or authority of Chieng or the Bank.  Lingad withdrew the amounts listed below from Chieng's PSD account, except the amount listed in the April 16, 2004 transaction.  On April 16, 2004, Lingad stole 4,863,377.67 pesos from the Bank to issue Manager's Check No. 5763 payable to Chieng, whose PSD account had matured.  Although the Manager's Check was issued in the amount of 5,134,947.62 pesos, the total damage to the bank is 4,863,377.67 pesos because the PSD account had a balance of 271,569.95 pesos at the time the check was issued (5,134,947.62 - 271,569.95 = 4,863,377.67).  The unauthorized transactions listed below constitute 9 of the 25 counts of Qualified Theft against Lingad.

| Date of Transaction | Bank Account | Information Annex | Evidence Supporting Charges |
|---|---|---|---|
| Dec 4, 2003 | 2268-B | B-23 | Annex 22:  Acknowledgment Receipt No. 0039310 for deposit of 5,000,000.00 pesos issued by Lingad for Chieng.  On December 3, 2003, Lingad processed the opening of Premium Savings Deposit accounts for Chieng in the total amount of 11,519,884.12 pesos.  Of this amount, 5,000,000.00 pesos was used as an initial deposit for PSD Account No. 2268-B. This Acknowledgment Receipt is evidence of that deposit.<br><br>Annex 23 & 23-A:  Printout of the Online Journal Listing Teller TIER (Annex 23) showing the history of unauthorized withdrawals by Lingad from Chieng's PSD Account No. 2268-B.  Printouts of History of Account (Annex 23-A).  According to Recio's affidavit, Lingad's withdrawals are not documented, but they appear in these printouts.<br>Annex 24 & 24-A:  Acknowledgment Receipts issued by Lingad to Chieng to make him believe that the deposit and interest earned under PSD Account No. 2268-B was intact. |

| Date of Transaction | Bank Account | Information Annex | Evidence Supporting Charges |
|---|---|---|---|
| Dec 5, 2003 | 2268-B | B-8 | Same as December 4, 2003 with the exception of:<br><br>Annex 23 & *23-B*:  Printout of the Online Journal Listing Teller TIER (Annex 23) showing the history of unauthorized withdrawals by Lingad from Chieng's PSD Account No. 2268-B.  Printouts of History of Account (Annex 23-B).  According to Recio's affidavit, Lingad's withdrawals are not documented, but they appear in these printouts. |
| Dec 8, 2003 | 2268-B | B-9 | Same as December 4, 2003 with the exception of:<br><br>Annex 23 & *23-D*:  Printout of the Online Journal Listing Teller TIER (Annex 23) showing the history of unauthorized withdrawals by Lingad from Chieng's PSD Account No. 2268-B.  Printouts of History of Account (Annex 23-D).  According to Recio's affidavit, Lingad's withdrawals are not documented, but they appear in these printouts. |
| Dec 8, 2003 | 2268-B | B-10 | Same as December 4, 2003 with the exception of:<br><br>Annex 23 & *23-C*:  Printout of the Online Journal Listing Teller TIER (Annex 23) showing the history of unauthorized withdrawals by Lingad from Chieng's PSD Account No. 2268-B.  Printouts of History of Account (Annex 23-C).  According to Recio's affidavit, Lingad's withdrawals are not documented, but they appear in these printouts. |
| Dec 12, 2003 | 2268-B | B-11 | Same as December 4, 2003 with the exception of:<br><br>Annex 23 & *23-E*:  Printout of the Online Journal Listing Teller TIER (Annex 23) showing the history of unauthorized withdrawals by Lingad from Chieng's PSD Account No. 2268-B.  Printouts of History of |

| Date of Transaction | Bank Account | Information Annex | Evidence Supporting Charges |
|---|---|---|---|
| | | | Account (Annex 23-E). According to Recio's affidavit, Lingad's withdrawals are not documented, but they appear in these printouts. |
| Dec 15, 2003 | 2268-B | B-22 | Same as December 4, 2003 with the exception of:<br><br>Annex 23 & *23-G*: Printout of the Online Journal Listing Teller TIER (Annex 23) showing the history of unauthorized withdrawals by Lingad from Chieng's PSD Account No. 2268-B. Printouts of History of Account (Annex 23-G). According to Recio's affidavit, Lingad's withdrawals are not documented, but they appear in these printouts. |
| Dec 15, 2003 | 2268-B | B-3 | Same as December 4, 2003 with the exception of:<br><br>Annex 23 & *23-F*: Printout of the Online Journal Listing Teller TIER (Annex 23) showing the history of unauthorized withdrawals by Lingad from Chieng's PSD Account No. 2268-B. Printouts of History of Account (Annex 23-F). According to Recio's affidavit, Lingad's withdrawals are not documented, but they appear in these printouts. |
| Dec 15, 2003 | 2268-B | B-24 | Same as December 4, 2003 with the exception of:<br><br>Annex 23 & *23-G*: Printout of the Online Journal Listing Teller TIER (Annex 23) showing the history of unauthorized withdrawals by Lingad from Chieng's PSD Account No. 2268-B. Printouts of History of Account (Annex 23-G). According to Recio's affidavit, Lingad's withdrawals are not documented, but they appear in these printouts. |
| Jan 8, 2004 | 2268-B | B-20 | Same as December 4, 2003 with the exception of: |

| Date of Transaction | Bank Account | Information Annex | Evidence Supporting Charges |
|---|---|---|---|
| | | | Annex 23:  Printout of the Online Journal Listing Teller TIER showing the history of unauthorized withdrawals by Lingad from Chieng's PSD Account No. 2268-B.  There is no printout of History of Account to support this transaction.  According to Recio's affidavit, Lingad's withdrawals are not documented, but they appear in these printouts. |
| April 16, 2004 | 2268-B | B-15 | Annex 25:  Manager's Check No. 5763 processed by Lingad in the amount of 5,134,947.62 pesos payable to Chieng, whose PSD Account No. 2268-B had matured.  Lingad co-signed this check. |

## Additional Evidence Supporting 25 Counts of Qualified Theft

1. Annex 26, Affidavit of Danilo De La Cruz, Security Guard of the Ultra Agency assigned to the Olongapo City Branch of the UCPB.  De La Cruz was on duty on Saturday, April 17, 2004.  According to De La Cruz, Lingad arrived at the bank at about 9:30 a.m. and stayed until 1:10 p.m.  His affidavit includes a logbook for April 17, 2004 showing Lingad's entry.  While at the office, De La Cruz noticed Lingad was not working at her working area.  Instead, he found her working on the computer located at the back office area.

2. Annex H-1, Affidavit of Ma. Edene M. Recio.  According to Recio, Lingad was the only person at the bank on April 17, 2004 between the hours of 9:30 a.m. and 1:10 p.m.  Recio also indicates that significant damage was done to several of UCPB's computers.  Specifically, Recio states that system disks and data on the computers were destroyed.  Further, a sticky substance seemed to have been poured over the back-up tapes used as back-up for the computerized database of the bank, thus destroying them.  Lingad did not report to work on the following Monday, April 19, 2004, and flew to the United States on April 20, 2004.

3. Additionally, according to Recio's affidavit, further investigation revealed that Lingad and her family had been acquiring properties beyond their means starting in 2001, such as a beach house costing 1,600,000.00 pesos.

   a. Annex 28:  Affidavit from construction workers hired to build a beach house for Lingad; construction contract; pictures of the beach house; and checks issued by Lingad to the construction company.

   b. Annex 29:  Vehicle Verification Report prepared by the Bank's credit administration Division.

13

**(3)     One (1) count of Qualified Theft through Falsification of Commercial Documents by a Private Individual under Article 172(2) in relation to Article 171**

<u>**Summary of Charge**</u>:

On several occasions between August 4 and August 25, 2003, Lingad falsified the records of UCPB by making it appear that the client, Chieng, pre-terminated his Premium Savings Deposit Account (PSD).  These pre-terminations were done without Chieng's knowledge or authorization.

On October 30, 2003, Lingad falsified UCPB's records by making it appear that several clients of the bank pre-terminated their PSD accounts when in fact these pre-terminations were done without their authority.  Lingad took the deposits from various client accounts to satisfy Chieng's account, which became due on October 30, 2003.  The total amount taken from the accounts was 11,254,972.61 pesos.

<u>Evidence Supporting Pre-Terminations between August 4 and August 25, 2003</u>

1.  Annex B:  Deposit slip documenting Chieng's deposit of 11,065,541.67 pesos.
2.  Annex C:  PSD history of Chieng's account, showing various unauthorized pre-terminations by Lingad.  As a result of Lingad's pre-terminations, the balance was reduced to zero.  According to the U.S. Attorney's Summary of Evidence for Extradition of Respondent, this document shows Lingad's User ID "oloma01."

<u>Evidence Supporting Pre-Terminations on October 30, 2003</u>

1.  Annex D:  PSD history showing the accounts pre-terminated by Lingad without the authority of the account holders.  Lingad's User ID "oloma01" appears beside each transaction.
2.  Annex A:  List of all authorized computer users with their User IDs.  This shows that Lingad's User ID was "oloma01."